Your Honor, may it please the court, I'm Kane St. John. I'm here on behalf of the appellants Najarian Capital LLC and Najarian Holdings LLC. This is a case brought by borrowers against a lender, but it is not the usual case of a borrower trying to excuse itself from paying its debt. It is undisputed that the borrowers paid every dime charged to them by the lender. This is instead a lender that thumbs its nose at case law that makes abundantly clear that late fee charges on these loans were illegal penalties as a matter of law. Weren't these fees paid over a period of time? All the late, every fee that was charged was paid, Your Honor. Every late fee, every release fee. At what point did decide to challenge them? After the relationship ended entirely and every loan advance had been paid. Your Honor, this is also a case in which the lender insists that the court should rewrite the lender's own loan agreements. Those loan agreements render the borrowers not liable for the excessive undisclosed charges of the loan servicer hired by the lender. And this case is also about a lender that insists that it should not be bound by the language of the forbearance agreement that it drafted and then failed to sign. Well, let's talk specifically about each one of the challenged fees. So you're challenging the $250 release fee for document processing and for lien release for each one of the purchasing documents. Is that correct? That's essentially correct, Your Honor. All right, so what is the problem? Why was that illegal? Why was that fee illegal? That fee wasn't illegal, Your Honor. That was merely unauthorized by the loan documents signed by the parties. Okay, and so why was it unauthorized by the loan documents? Because essentially, Your Honor, because the loan documents author, there was an overarching set of each property that one of my clients purchased or financed, my client paid a 2% fee for the money that would allow the purchase of the property or the financing of the property, the refinancing of the property. So there was a fee paid up front, and then the loan documents also required the borrowers, my clients, to pay any fees that were incurred by the lender. And various classes of fees and costs and expenses are described in the loan documents. The problem that my client has with this $250 release fee charged by the loan servicer, a couple of problems, Your Honor. One is, that was a fee that was never incurred by the lender. Before the loan relationships with my client began... How much does this all add up to? $250 times however many, what's the total? I believe somewhere in the neighborhood of $200,000 or $220,000 for the release fees, Your Honor. I mean, most people don't pay $200,000 or $225,000 in fees over a period of years that they don't think they were obligated to pay without saying something along the way, right? That's probably true, Your Honor, but most people don't. The fact that of the $250 change was not, excuse me, charge, was not even known to my client until a loan became due. That is, until the property had been purchased, had been renovated, and then when it's sold to the ultimate homebuyer, then there's a closing. And at the closing, the loan servicer sends a document that includes a $250 charge from the loan servicer that it essentially pays its administrative costs and also whatever the cost is of the clerk of the county court to actually file the release of the security deed. So, yes, maybe we wouldn't be here if my client had stopped this loan relationship earlier, but the fact is, it wasn't disclosed at the outset, and at the time, it had to be released. Once they sell the property, obviously, the security deed has to be released in order to sell the property and pay off the loan. So, these fees were known to my client only at the end of each... But is it correct that to even get to this issue of these fees, we would first have to conclude that the release does not cover either some or all of the release fee? And you're talking about the release fee, I assume? No, the release. I'm talking about the actual release, the release of liability. Oh, the forbearance agreement that was not signed by the lender? Well, that's your position, but yes. I mean, why does that not apply here? Well, Your Honor, it's not actually just my position that the forbearance agreement was not signed. It wasn't signed, and Corvette acknowledges that. Was this argument raised below, the importance of it not being signed or the relevance of it not being signed? It was. It wasn't raised as well as it might have been, Your Honor. Where was it raised? Show us in the record where this argument was raised. Could you point to a page? Your Honor, I would have to, I'm sorry, I don't have the page number available to me. I was going to say it was raised in the, it was raised, but it wasn't raised nearly as thoroughly as it was in the appellate release. Did the district court address it? The district court, to my recollection, did not address it. But Your Honor, the release is a matter on which the lender, of course, would bear the burden of proof at trial. It would be required in the summary judgment proceedings to be able to make out a prima facie case of the validity of the release. And under the jurisprudence of California- But you would first have to challenge, you would first have to raise it. If the lender raised it as an affirmative defense, then you would have to challenge whether or not it was valid. The lender wouldn't have to assert the validity in the first instance. Well, Your Honor, I would propose that the initial burden on summary judgment had not been met when you simply introduce a document that has no legal- But your client signed the document, right? Yeah. Your client signed this document. Correct. My client did sign the documents. The lender did not sign the documents. The signature is important to enforce if it's the person who's being compelled to comply with the document. If that person has signed it, that's the most important part of it. So the issue becomes, you know, your client signed it. And so why shouldn't your client be bound by a document it signed? Your Honor, because under the California jurisprudence cited in the brief, the lender could at any point repudiate the agreement, because where the validity of the agreement is expressly conditioned upon the signature of a party and that party does not sign estoppel, parole evidence, none of those rules apply. The agreement is simply unenforceable. And again, that's this court's decision in Roth. So that document- Did the lender here ever repudiate these agreements? We don't. Your Honor, there's no evidence of repudiation. There's no evidence that the lender exercised its discretion to say that they signed a document when there isn't any evidence of a signed document. There's simply- What we have here is the successor entity, Corvest, arguing that this court should infer that the original lender, CAF, somehow exercised its discretion to decide that up is down and down is up. In other words, that the document was signed when, in fact, it was not signed. Well, the parties complied with the agreement for a number of years. And so, you know, by their performance, they gave effect to the document. Your Honor, that's not a ridiculous argument, of course, but- I'm not arguing anything. I'm just stating the facts. To say that the parties executed the agreement. And under contract law, a contract can be enforced through execution. Well, Your Honor, this is a special case. And you'll see in the brief, I've cited a California case that partial performance by the non-signing party does not provide any relief after the fact for that non-signing party to argue that the contract is enforced. That's not partial performance. You just told us that all of the payments were made. This contract has been completely executed. There is no partial performance issue. Well, the lender is attempting to rely on this unsigned document now to claim that many claims were released pursuant to this forbearance agreement. And I'm saying under California law, if it isn't signed by the lender and the lender has said it must be signed, then you can't even make the estoppel argument or some other argument that provides cover and indicates that the agreement is enforceable. It simply isn't enforceable because if California law is not followed and you say the lender can come in any time to claim that it's enforceable, the lender could also come in at any time and repudiate the agreement. And the California cases say, sure, you can repudiate it because you never signed it. And the parties agree that in order for it to be enforceable, it had to be signed. Counsel. Yes, sir. I think I share a concern Judge Rawlinson earlier raised as to why this should not be enforceable against the party who signed it. Now, you've argued that the lender could have repudiated, but to make your claim, wouldn't you have to submit some evidence that the lender did repudiate these agreements? I don't believe that's my burden, and I don't know whether or not they repudiated it or not, Your Honor, but if it's not enforceable because of the risk of repudiation, now we have to wait indefinitely. I mean, these contracts were signed in 2014, I believe, to find out whether or not the lender is going to decide that it is bound or is not bound by the agreement. That's what California law is designed to prevent. I'm happy to address any additional questions, but I see I'm down to three minutes. If I might reserve that time for rebuttal. Yes, you may. Thank you, Your Honor. All right. We'll hear from Corvast. Good morning, Your Honors, and may it please the Court. My name is Emile Petrosian. I represent Corvast, American Finance Lender. I'd like to start off by discussing the release very briefly. There are a few key undisputed material facts that pertain to the release issue that I want to make sure we're bearing in mind here this morning. The first is that there were two initial loan agreements between Nijarian Capital and Nijarian Holdings on one side and CIF lending, what I refer to shorthand as CAF lending, on the other hand. And those agreements were executed in 2014. And each one of those agreements had a one-year term. And the later of the two agreements expired on October 2, 2015, one year after it was executed. And it was at the time of the expiration of that agreement, Nijarian Holdings and CAF lending entered into a new loan agreement in 2015. And it's in conjunction with the 2015 loan agreement that they entered into the First Amendment to the prior loan agreement. And it's that First Amendment that contains the release. Those two instruments were negotiated, executed at the same time by the same parties and related to the same subject matter. We understand that. But do you challenge the contention that it was not signed by your client? We — I'll say two things about that, Your Honor. We don't challenge that the document in the record is unsigned by CAF, the First Amendment. It does not bear CAF's signature. We don't dispute that. Unfortunately, because this issue wasn't raised below, we didn't have an opportunity to address it in our summary judgment papers. Ultimately — and I think the Court's questioning this morning reflects this — ultimately, the lack of CAF's signature is irrelevant because the party to be charged, i.e., here Nijarian Holdings and its affiliates, did sign the First Amendment. And equally as importantly, they received the benefit of the bargain that they received from the First Amendment and the corresponding 2015 loan agreement. And that's a key point we made in our papers, Your Honor, and I'd like to just emphasize it today. The release was consideration to CAF Lending in exchange for its agreement to enter into a new loan agreement, to continue the lending relationship, to extend some of the repayment dates on some of the existing loans, and to increase the amount of the credit facility for Nijarian Holdings from $5 million to $15 million. So the argument that's being put forth by the appellants today and in their papers would deprive Corvettes of the benefit of its bargain while allowing them to keep their benefit. Because there's no dispute that they got loans under the 2015 loan agreements. There's no dispute that they received the extensions, the forbearance, as they refer to it in their papers. And so what California law says is a party cannot raise that argument. And I'll cite a case momentarily. California Supreme Court, in an en banc decision in the Monarco case, the citation is 35 Cal Second 621. We didn't cite that in our papers, Your Honor, because a lot of these arguments ultimately were set forth for the first time in the reply brief, particularly the argument that there was no First Amendment formed at all. But if you look at the Monarco case, it says that a party that has received the benefits of a contract is stopped from evading enforcement of that contract against it on the ground that it is unsigned if an unjust enrichment would ensue, which is the case here because they got their benefit of the bargain. I will also just point out that the language that is in the First Amendment that says that party signatures were an express condition to the amendment becoming effective was subject to CAF's, quote, sole and absolute discretion. So really what that shows is that's there for CAF's protection. And that's a point that we believe the appellants have simply ignored. They haven't addressed that. So if the release is enforceable, what does that then cover? It covers the $250 fees. And then it covers the late payments, although we still have to answer whether the late payments were improper liquidated damages. If as the district court found, if this court finds that the release is enforceable and it covers all of the claims, then the court would not need to address any other issues in the case. Even the liquidated damages issue? Even the liquidated damages issue, Your Honor, because all of the claims in this case arise under the 2014 loan agreements. There is no breach of contract claim in the action for breach of the 2015 loan agreement. And in fact, if you look at the 2015 loan agreement, it's governed by New York law. And all of their liquidated damages challenges arise under California law. And Mr. Najarian testified at his deposition under oath that they're suing under the 2014 loan agreements. And that issue has never been disputed in this court or in the district court. Is there not some argument that, well, if the late fees in the 2014 agreement are themselves invalid, then the release would be invalid to the extent it purported to release these claims? I think that's the public policy argument. I don't think any of the cases that they cited for that proposition would apply there, Your Honor. But even if it did, if the court did go look at the late fee issue on its substance, on its merits, and looked at California law, none of the cases that are cited in the appellant's briefing stands for the per se prohibition that they say exists, that a lender can never, under any circumstance, charge a late fee as a percentage of the outstanding loan balance. That is not the law in California. The Greentree case doesn't say it. Ridgely doesn't say it. Garrett doesn't say it. What those cases stand for is the proposition that a lender cannot charge a late fee as a percentage of an outstanding loan balance when an installment payment has not been made. And that's clearly not what happened here. In fact, there's evidence in the record, uncontroverted evidence, including the payoff statements that reflect that when an installment payment was missed, there was a small late fee, sometimes $50, $60, $70. There's 10 percent of the installment? In those instances, I believe it was already in the 2015 agreement, so it's 5 percent of the installment. But it's we're talking, you know, tens to hundreds of dollars. And you're saying the 2015 is not even in front of us? It's not even in front of you because they didn't sue under that agreement. What's interesting about the late fees, Your Honors, ultimately you wouldn't even really need to get into the legal issues because if you look at what we call the Greer spreadsheet in our papers, it's a spreadsheet that their 30B6 witness, Ms. Greer, prepared in connection with the litigation to show what their late fee challenges entail. There are 23 loan advances listed on that spreadsheet. She testified under oath, all of their late fees that they're challenging in this case are set forth in that spreadsheet. And if you look at the first column on that spreadsheet, it says the loan date. Every single one of those loans bears a date in 2016 and 2017. Most of them were December of 2016 forward, well over a year after the 2014 agreements had expired on their terms. So there's no evidence in the case that any late fees were even charged under the 2014 loan agreements. So it's not just that the evidence is uncontroverted. There is no evidence at all to support that there were late fees that were actually charged and were unreasonable in any way under the operative agreements in the case. So we do believe, Your Honor, that it would cover everything. There was the argument about the future claims. Everything comes down to the language of the release. The release is very broadly worded. The way that it defines claims, it's not just limited to... Claims, capital C, is not just limited to claims and causes of action. It includes any breach of contract arising from any legal or equitable theory of recovery that may have existed as of the date of the release, October 1, 2015. But not future claims? No, because it says as of that date. And frankly, I don't think future claims, a release of future claims is enforceable. So it's saying all then existing claims that may or may not be known, but on any theory of recovery that exists at that time. And there's no question that both theories of recovery, the late fees and the release fees, existed at that time. I do want to point out one thing very quickly on the release fee. Your Honor has inquired about, well, why would you pay hundreds of thousands of dollars of fee if you claim that it's unauthorized? I think what is very telling in this case, Your Honor, is that Mr. Najarian, who is the sole member of both appellants and their chief executive officer, complained about, at times, the release fee. He complained about the amount of the release fee. He said he thought it was too high because it was higher than what he was used to paying other lenders. And by no means was Corbett the only lender that the appellants used. He never once said, this fee is unauthorized. You're not entitled to charge this fee under our contract. That was never said until we saw the complaint. So I do think that that's a telling fact here to take into consideration. Finally, with respect to the release, I just want to point out, it does apply also to Najarian Capital, even though Najarian Capital is on a signatory to the release. And for that reason as well, Your Honor, it would apply to the entire case. We cited case law that shows that when two entities are under the common management and control of the same person, under California Corporations Code Section 150, they are affiliates as a matter of law. The uncontroverted evidence on the summary judgment record shows that Najarian Holdings and Najarian Capital are both run by the same person, conduct the same business, share the same office space. All of that is undisputed in the record. And so when you look at, again, the contract language in the release, it defines release or with a capital R to include Najarian Holdings and Mr. Najarian, both of the signatories, as well as their respective affiliates. And we know that it's okay for a party to sweep into a release its affiliates, successors, assigns, and so on, because no separate consideration is required for a release to be enforceable under California law. We cited California Civil Code Section 1541 in our papers, as well as the Crow case. So when you take all of that in its totality, you see that absolutely Najarian Holdings, which is run by the same person, Mr. Najarian, who also signed the release, can release all of these claims as of October 1st, 2015, on behalf of itself, as well as its affiliate, Najarian Capital. And there was no case law or argument, we believe, that rebutts that. With that, Your Honors, unless there are any other questions, I'm happy to submit to the Court. All right. Thank you, Counsel. Thank you. Roboto? Thank you, Your Honor. I just would point out that on pages 16 through 18 of the Appellant's Reply Brief are the cases Finney and Northam that address the issue of the fact that the non-signing party, the party that fails to sign, doesn't have an estoppel argument, can't claim that the agreement is enforceable and estop the other party. Your Honor, it's clear to understand here that although both Najarian Capital and Najarian Holdings signed agreements in 2014, only Najarian Holdings signed a second agreement overarching loan agreement in 2015. So the loans that were continuing to be made to Najarian Capital by CAF are loans that continue through 2015 and beyond. And the spreadsheet, it's important in response to Judge Bress's inquiry because the spreadsheet that Mr. Petrosian referred to, there's a second page to that spreadsheet in the record behind the first page that shows several loans closing later. Those were Najarian Capital loans. They all involve late fees. So if you're going to determine that all of the late fee issues are resolved by the release, then you must conclude that Najarian Capital is somehow bound by the release. To do that, you have to ignore the language in the release where the parties agree that all the claims being released are owned by Najarian Holdings or the guarantor. And that simply was not the case. There were claims also owned by Najarian Capital that did not sign that agreement and certainly did not own the claims owned by Najarian Holdings. So, Your Honor, at the beginning of the reply brief, there is a series of propositions that step the court through the additional issues that need to be resolved, even if this court were to determine that the release is valid, even though not signed by the lender. So I would refer you to that. I disagree with Mr. Petrosian's characterization that once you decide that the release is good, there aren't any other issues. For one thing, release fees, the $250 release fees, many of them were paid on the capital loans after the First Amendment was signed. And certainly there were also late fees that were signed after the release was signed. And those are claims that accrued in the future. The damages from those did not accrue until after the release is signed. So they couldn't have been released by the language of the release. I see the point. All right, thank you, counsel. You've exceeded your time. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: GOULD, RAWLINSON, BRESS